1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF GEORGIA
2                    SAVANNAH DIVISION

3   UNITED STATES OF AMERICA,    )
                                 )
4          Plaintiff,            )
                                 )
5     vs.                        )     CASE NO. 4:12-231
                                 )
6   CARLOS ANDRES BRUTUS,        )
                                 )
7          Defendant.            )
    ---------------------------

8

9

10

11

12

13            TRANSCRIPT OF SENTENCING HEARING
          **BEFORE THE HONORABLE B. AVANT EDENFIELD**
14              United States Courthouse
                   125 Bull Street
15                  Savannah, GA
                 September 5, 2013
16

17

18

19

20   COURT REPORTER:   Kelly McKee Dorsey, CCR, RPR, CRR
                       United States Court Reporter
21                     P. O. Box 8552
                       Savannah, GA  31412
22                     912-650-4065

23

24      (Proceedings reported by mechanical stenography, transcript
    produced by computer-aided transcription.)
25

1                    APPEARANCES OF COUNSEL

2     FOR THE UNITED STATES OF AMERICA:

3         JENNIFER GAYLE SOLARI, Esq.
          U.S. ATTORNEY'S OFFICE - SAVANNAH
4         P. O. Box 8970
          Savannah, GA 31412
5         912-201-2561
          Email:  jennifer.solari@usdoj.gov

6

7     FOR THE DEFENDANT:

8         ANNE PANNELL RODMAN, Esq.
          LAW OFFICE OF ANNE PANNELL
9         P. O. Box 14064
          Savannah, GA 31406
10        912-349-6582
          Email:  apannell@hotmail.com

11

12                        I N D E X

13
                                                  PAGE
14    WITNESSES

15        Joyie Jean Borgella
              Direct Examination by Ms. Solari      23
16            Cross-Examination by Ms. Rodman        32

17        Adam Rogalski
              Direct Examination by Ms. Solari      45
18            Cross-Examination by Ms. Rodman        50

19    Certificate of Reporter                       75

20

21

22

23

24

25

### P R O C E E D I N G S

**(9:39 a.m.)**

1        THE COURT:  Good morning, ladies and gentlemen.

THE AUDIENCE:  Good morning, Your Honor.

THE COURT:  Appreciate your presence.  Mr. Clerk, sound the case.

THE CLERK:  Court calls Case No. 4:12-cr-231, *United States of America versus Carlos Andres Brutus.*  Representing the United States of America is Jennifer Solari.  Representing the defendant is Ms. Anne Rodman.  Case is being called for sentencing, Your Honor.

MS. SOLARI:  Your Honor, my case agent, Special Agent Adam Rogalski, is expected to testify today in response to one of the defendant's objections to the presentence report.  He's in the building.  He's currently on the stand in Judge Smith's courtroom in a motion to suppress.  I expect he'll be done shortly, and I'm ready to proceed at least at the outset without him.

THE COURT:  Very good.  Well, if we have to pause a few minutes, we will.

MS. SOLARI:  Yes, sir.

THE COURT:  Ms. Rodman, are we ready?

MS. RODMAN:  Judge, just a quick preliminary matter.  I am certainly prepared to proceed today.  My client, Mr. Brutus, says that he wishes to represent himself at this hearing today.

1    So I'm certainly prepared to proceed on this if the Court wishes

2    that I do so, but as I said, my client wants to go ahead and

3    represent himself today.

4         THE COURT:  Well, he can't have you and himself.

5         MS. RODMAN:  Right.

6         THE COURT:  Now, Mr. Brutus, you're looking at a

7    significant sentence.  You understand that?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  And the Federal Sentencing Guidelines

10   sentencings and all are somewhat involved.

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  And they will control your future.

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  You have pled guilty.  I have a presentence

15   report from the probation officers.  I have the Rule 11 colloquy

16   transcribed.  I have reviewed that.  What is it that you are

17   upset with about your lawyer?  If you may tell me.

18        THE DEFENDANT:  Yes, Your Honor.  I had a -- may I

19   approach the Bench to read a statement?

20        THE COURT:  Yes.

21        THE DEFENDANT:  Thank you.  Your Honor, the purpose of

22   this statement is about my situation of ineffective assistance

23   of counsel.  I plan to establish that as a case by a

24   preponderance of the evidence.  My counsel's services to me in

25   this criminal case fall so short of what a reasonably competent

1 attorney would do that --

2      THE COURT:  You have copied something right out of a

3 case book somewhere, but go ahead.

4      THE DEFENDANT:  Yes, sir.

5      THE COURT:  Or a brief.

6      THE DEFENDANT:  Yes, sir.  My counsel's services to me

7 in this criminal case fall so short of what a reasonably

8 competent attorney would do that it violates the 6th Amendment

9 of the Constitution, my right to counsel.

10      I truly do believe my lawyer misrepresented me in the

11 signing of my plea.  Before I signed my plea I told my lawyer

12 many times that I do not agree with the facts stipulated in my

13 plea and that there was discrepancies in the evidence as it

14 relates to my case.

15      I signed my plea under duress due to the fact that she

16 gave me no other recourse and told me I had to sign because I

17 could not prove my case, basically implying that the burden of

18 proof is on me.  She failed to explain that I had the right to

19 debate certain facts within my plea before signing and that I

20 had the right to not sign it at all.

21      She failed to work in my best interest.  Whether she

22 knowingly did it with negligence or mistakenly did it due to

23 inexperience as a lawyer, I am not sure.  But I am certain that

24 my plea of guilty was not freely and voluntarily given or wasn't

25 entered knowingly.

1    I have never been in a situation where I needed a

2    lawyer, so I'm at the mercy of my counsel's guidance and

3    experience, but I do believe in my heart that the object of all

4    legal investigation is the discovery of truth.  I know for a

5    fact that the U. S. Attorney's Office case against me is not

6    fully based on truth.

7    I fully understand that providing effective assistance

8    is not limited to a single path.  No detailed rules or

9    guidelines for adequate representation are appropriate.  Any

10   such set of rules would interfere with the constitutionally

11   protected independence of counsel and restrict the wide latitude

12   counsel must have in making tactical decisions.

13   But I believe it is unprofessional error for my counsel

14   to disregard her own client when he is trying to tell her that

15   the plea brought before him is not based on truth.

16   It is alarming in a case where a lawyer has a client

17   with 300 or more pieces of evidence that he or she not explain

18   to the client the Federal Rules of Evidence before the client

19   decides to enter a plea with the government.

20   I signed my plea with the lack of knowledge of the true

21   understanding of my plea and without guidance from my counsel to

22   understand that I neither have the burden of proof nor the

23   burden of persuasion with regard to proving the offenses

24   charged.

25   Ms. Rodman never explained that it is Ms. Solari, the

1  U. S. Attorney's, job to prove every element of the accusation

2  or indictment.  I was on the docket to be sentenced on July the

3  16th.  It was by the grace of God that I was taken off due to

4  the fact that my lawyer had a baby, and during that time I came

5  across Rule 102 of the Federal Rules of Evidence, which states,

6  "these rules shall be construed to secure fairness in

7  administration, elimination of unjustifiable expense and delay

8  and promotion of growth and development of the law of evidence

9  to the end that the truth may be ascertained and proceedings

10  justly determined."

11      How can the truth be ascertained and the proceedings

12  justly determined when your lawyer is coaching you on what to

13  say before you plead guilty after you have told her that you

14  feel you are entering the plea under duress?

15      I want to convey to the Court today that I'm not trying

16  to use my lawyer as a scapegoat for my benefit in

17  post-conviction proceedings because I have not been sentenced

18  or convicted.

19      Your Honor, I understand fully that plea bargains tend

20  to be favored by the Court because of their specified intent to

21  shorten, simplify and settle disputes as well as reduce the

22  cost of litigation, but the requirement that guilt of a

23  criminal charge be established by proof beyond a reasonable

24  doubt dates at least from our early years as a nation.

25      The necessity of proof by the government beyond a

1   reasonable doubt is a constitutional right guaranteed by the

2   Due Process Clause of the United States Constitution. Due to

3   deficient attorney performance, I was not afforded that right.

4   My life is at stake here, and I fully believe that the conduct

5   of my counsel throughout this whole case will give way to

6   prejudice resulting from attorney error that is sufficient

7   enough to undermine the confidence and outcome of my case.

8         That is all I wanted to say about the statement here.

9         THE COURT: Okay. You remember you were here in this

10   courtroom on January the 16th, 2013, this year.

11         THE DEFENDANT: Yes, Your Honor.

12         THE COURT: And I had you placed under oath. You

13   remember that? You took an oath.

14         THE DEFENDANT: Yes, Your Honor.

15         THE COURT: Correct? And you said you understood the

16   significance of the oath, that it required that you tell the

17   truth.

18         THE DEFENDANT: Yes, Your Honor.

19         THE COURT: And I explained to you that -- you said you

20   fully understood where you were, what you were doing, that you

21   had had time to meet with your lawyer and discuss it with her,

22   that you were not under the influence of pain, medication, any

23   drugs, any alcohol, and I said that you were presumed to be

24   innocent and you did not have to prove your innocence. The

25   government, having filed the charges, assumes the burden of

1    proof to convince a fair and impartial judge and jury that you

2    are guilty beyond any reasonable doubt before you may be

3    convicted.

4         THE DEFENDANT:  May I speak, Your Honor?

5         THE COURT:  You have -- no.  I've listened to you.  You

6    listen to me.

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  You have no obligation to prove anything

9    because you're presumed to be innocent.  For page after page I

10   explained to you that you were entitled to a jury trial and the

11   presumption of innocence.  I explained to you the essential

12   elements that had to be proved beyond a reasonable doubt.

13        And then I asked you about your lawyer, and after I --

14   your lawyer had mentioned the Federal Sentencing Guidelines, and

15   I explained those to you, that the Court is not restricted to

16   looking at the two counts, that the -- all of the relevant

17   conduct could be and would be considered by the Court.  And I

18   told you they were advisory.

19        Now, you swore under your oath that you understood all

20   of that, that you were making the plea freely and voluntarily.

21        "And has your lawyer explained to you?"

22        "Did you read the plea agreement?"  You swore under oath

23   that you did.

24        "And did you give her your permission to discuss it with

25   the government?"

1    And the Court called on Ms. Solari, the prosecutor, to

2    go over the charges and to review what the plea agreement --

3    what you agreed to do and what the government agreed to do.

4    And then I asked you, "was that consistent with your

5    understanding?"  And you said "yes."

6    "And do you have any promises?"  No, you did not.

7    "And have you answered truthfully every question I

8    asked?"  You said, "yes."

9    So now, today, you said that you were not telling the

10   truth then.  Is that what you're telling me?

11   THE DEFENDANT:  Your Honor, I did not --

12   THE COURT:  Say, just tell me, were you telling the

13   truth then?

14   THE DEFENDANT:  Your Honor, once again --

15   THE COURT:  No.  I asked you were you telling the truth

16   to me.

17   THE DEFENDANT:  I'm going to respond to your question,

18   Your Honor.

19   THE COURT:  No, you're not going to respond unless you

20   answer the question yes or no.

21   THE DEFENDANT:  Was I telling the truth.

22   THE COURT:  Yes.

23   THE DEFENDANT:  The response is to that question I was

24   telling the truth and I did not enter that plea knowingly and

25   intelligently, and on the record it will show in that same day

1  that I said that there was certain discrepancies in this case

2  that were not being talked about.  And the district attorney,

3  Ms. Solari, turned around and said, well, Mr. Brutus is still

4  lying.

5       At that point you told me, well, you need to still --

6  you need to think about this situation.  It is on the record.

7       I did not understand that I had a constitutional right

8  for Ms. Solari to prove every single charge in that.  No, I did

9  not understand that.

10       I explained to my attorney before I signed that plea

11  that the plea had untruths in that.  She told me that I could

12  not prove that case.

13       I'm not a lawyer.  I go to a doctor for a medical

14  diagnosis; I go to a mechanic for a mechanical diagnosis.  So

15  I'm in a jail where there's no law, no law library or anything.

16  All my advice I get from my attorney.

17       I explained to my attorney that this case and the plea

18  agreement was not based on truth.  She told me that there was

19  nothing that I could do.

20       So in this respect, I feel that I was given ineffective

21  assistance of counsel and that I entered my plea unknowingly,

22  unintelligently and without an understanding of its

23  consequences.  And that's what I feel, Your Honor, and I said it

24  that day.

25       But as always, because I'm a person that I don't have

1  any skill or any knowledge about the law, as any average person

2  might not have, I did not fully understand my --

3      THE COURT:  You heard -- you heard the question asked of

4  the agent:  "Did the defendant," meaning you, "admit to you his

5  knowledge that all 312 checks involved in this scheme and that

6  he presented at the Cha's Variety Store were either stolen or

7  counterfeit?"  And, "yes."  The answer said yes, you had

8  admitted it.

9      THE DEFENDANT:  Your Honor --

10     THE COURT:  "And that all of the endorsements on those

11 checks were forged or falsely made."  "Yes."

12     "And that he knew he had no legitimate authority to

13 negotiate these checks?"  The answer was yes.  "And having

14 examined the checks is" -- and I'm on Page 51, "is it the case

15 that the aggregate amount, face value of all 312 checks involved

16 in the scheme approximates $1,134,000?"  "Yes."

17     "And now, not all 312 checks are alleged in the

18 indictment; correct?"  "Correct."

19     So here the Court has examined you, the Court has taken

20 evidence; you were listening to it, and now I'm told today by

21 you that all of that was fraudulent.  Am I correct?

22     THE DEFENDANT:  Your Honor, I'm not saying all of that

23 was fraudulent.  What I'm here to say today is that the case

24 that the district attorney brought against me and the situation

25 of effective assistance of my lawyer was not properly given to

1   me to actually get a fair trial and a fair case, and that's what

2   I'm here to talk about today, even though I'm getting sentenced.

3       I'm asking that I have a fair trial, and it wasn't fair.

4   I'm not saying that what's untruth about this case or what's not

5   untruth, but I can show that today.

6       THE COURT:  What was deficient about your lawyer's

7   performance?  I know that you were explained the essential

8   elements of the offense.  I know that you were told about the

9   burden of proof.  You acknowledged under oath all of that.  So

10  where was her work ineffective?

11      THE DEFENDANT:  Where my lawyer was deficient throughout

12  this whole case, she did not give me certain discovery that I

13  spoke to her about.  This case that I have right here is a

14  conspiracy for a million dollars in checks; correct?  And

15  there's another count for bank fraud, which is that's what -- it

16  was originally 300 and something charges.

17      Now, I told my lawyer from the beginning and even on the

18  PSI that Mr. Pearce here has in there and throughout this whole

19  case that I did not cash a million dollars in checks.  I did not

20  do that.  I explained to my lawyer that I did not cash that

21  amount in checks.

22      My lawyer explained to me that you cannot prove your

23  case when that is not the case.  I asked my lawyer, I said, the

24  only checks that can be linked to me, Mr. Brutus, is the checks

25  that are attached with the power of attorney.  That is the only

1  checks that could be actually linked to me.

2      There's a sufficient amount of deficiencies in this

3  case.  The U. S. District Attorney's Office has conducted

4  misconduct in this case, and there's a lot of prejudice in this

5  case because there was more than one person that was on this

6  case with me, and they dropped her from the case, which is

7  Ms. Ok Cha.  And that is so vital to this case when they dropped

8  Ms. Ok Cha, because how can Ms. Ok Cha cash a million dollars in

9  checks from me when I'm saying from the beginning of this case

10  that only checks that can be linked to me are power of

11  attorneys.  So what it would mean is that Ms. Ok Cha --

12      THE COURT:  I don't care to hear any more.  Ms. Rodman,

13  how do you respond to?

14      MS. RODMAN:  Well, Judge, where to begin.  As far as

15  going over the plea agreement, going over sentencing, explaining

16  the burden of proof, we did all these things.  We went over

17  everything extensively.

18      I'll tell you, Mr. Brutus is someone who I spent a lot

19  of time with.  We met, to my count, 17 different occasions, and

20  each one approximately an hour.  He had a lot of questions about

21  his case, and we went over everything and in a lot of extent.

22      And we did go over sentencing.  I went over the plea

23  agreement prior to the change-of-plea hearing.  We discussed the

24  types of questions that you would be asking.  I used a

25  transcript so that we wouldn't have any surprises when we got to

1  the change-of-plea hearing.

2       We went over it.  And he had the opportunity to ask me

3  any questions if he was concerned about anything.

4       I've also -- I've drafted a rough memorandum at this

5  point that I will be submitting on the record to show the work

6  that I have done in this case.

7       THE COURT:  Well, I will hear anything from the

8  government if they care to.  Did you disclose all of the

9  open-file discovery, Ms. Solari, as part of your prosecutorial

10 undertakings in this case?

11      MS. SOLARI:  Yes, sir, Your Honor, I did.  I discussed

12 it extensively with Ms. Rodman.  I know that Mr. Brutus was

13 provided discovery by his counsel, as evidenced by the fact that

14 he mailed it to the DEA from the Liberty County Jail as if he

15 himself had collected that information.

16      In addition to discovering -- talking with Ms. Rodman

17 about the discovery and knowing she had provided the same to her

18 client, Ms. Rodman arranged a proffer meeting at her client's

19 request that occurred on December 7, 2012, which she attended

20 and I saw her at that time explain the proffer agreement to her

21 client.  She also explained to him at that time the potential

22 for a 5K consideration.

23      I spoke with Ms. Rodman on several occasions to

24 negotiate a plea agreement between the government and her

25 client.  She initially approached me for a plea agreement more

1   favorable to her client to which I would not agree, and so that

2   resulted in the eventual plea agreement which the Court has

3   before it that resulted in the dismissal of over 200 counts that

4   the defendant was facing as well as the government's agreement

5   to forego criminal forfeiture, which is certainly favorable to

6   Mr. Brutus.

7        Ms. Rodman specifically told me there would be a

8   several-day delay in Mr. Brutus' signing of the plea agreement

9   because she told me that she had gone over it with him

10  extensively, but he wanted to keep it with him so that he could

11  read it and consider it further before he signed it.

12       And finally, as the Court knows, Ms. Rodman filed

13  numerous objections to the presentence report.  She has

14  vigorously defended her client's position at a resolution

15  conference and maintains certain objections now, after

16  conferring extensively with her client, about which ones he

17  wished to pursue at his hearing today, Your Honor.

18       THE COURT:  The Court has heard no reason to postpone

19  the sentencing hearing.  I will ask Ms. Rodman to remain and to

20  make sure that everything is accounted for, and we will proceed.

21       The Court will not substitute counsel.  I will hear

22  extensively from the defendant, but I will ask her also to

23  remain and to ensure the adequacy of the sentencing hearing.

24       You may have a seat.  The Court has sounded the case of

25  the *United States versus Carlos Andres Brutus,* and the clerk has

1   given the appropriate docket number.

2          As I noted earlier, the Court has gone back and looked

3   at an extensive, lengthy Rule 11 colloquy.  I believe I have the

4   plea agreement before me.  And Ms. Rodman asked delay in this

5   case because of her pregnancy, and the Court gave that.  So the

6   Rule 11 was on January the 16th.  We are into the ninth month of

7   the year, and everything's been examined and there's no reason

8   to delay.

9          Pursuant to the plea agreement, the defendant pled

10  guilty and was found guilty of Count 1 of the indictment

11  charging him with conspiracy, in violation of 18 U.S.C. § 371,

12  and Count 100 of the indictment charging him with bank fraud, in

13  violation of 18 U.S.C. 1344.

14         With the completion and acceptance and the verification

15  of the criminal conduct under oath in the presence of the

16  defendant, with the defendant's counsel present and the

17  acknowledgment by the defendant by acquiescing that the agent

18  had interviewed him and that the facts were correct, the Court

19  accepted the plea agreement and directed the probation officers

20  to conduct a presentence investigation, to disclose the report

21  to the government and to the defendant and ultimately when all

22  matters were reconciled that could be reconciled, to deliver a

23  copy to the Court.  All of that has been done.

24         Now, there are objections today outstanding, and the

25  Court is prepared to hear those.

1      Now, has the government received a copy of the report?

2  I'm sure you have.

3      MS. SOLARI:  Yes, Your Honor.

4      THE COURT:  Does the government have any objections?

5      MS. SOLARI:  We do not.

6      THE COURT:  Ms. Rodman, let's take up the objections you

7  have filed.  You object to role in the offense, Paragraph 42.

8      "The Defendant Brutus objects to being an organizer or

9  leader of this conspiracy.  The commentary to U.S.S.G. 3B1.1

10 specifies the factors that should be to determine whether a

11 person qualifies for a leadership enhancement.  Many of these

12 factors do not apply to Brutus at all.  Brutus never recruited

13 any accomplice.  Brutus merely cashed the checks with Ok Cha

14 Mobley.  The government has never indicated" -- I'm reading --

15 "any wrongdoing on the part of Mobley, and she was never

16 indicted in this case.  There is no evidence that Brutus

17 conspired with her to fraudulently cash the checks or that he

18 ever gave her any indication that the checks were fraudulent.

19 The power of attorney documents were used by Brutus in order to

20 defraud Mobley.  She was merely the owner of the establishment

21 that allowed Brutus to cash large quantities of Treasury checks

22 and has been presented by the government as a victim in this

23 case rather than a co-conspirator."

24      Reading further, next paragraph, "Further, there is no

25 evidence that Brutus recruited or was directing the activities

1   of Borgella.  The presentence investigation reports specifics

2   only that Borgella stated that Brutus approached him and asked

3   him if he knew of any sources for checks.  The commentary to

4   U.S.S.G. 3B1.1 specifically states that this adjustment does not

5   apply to a defendant who merely suggests committing an offense.

6   Presentence investigation report also fails to say how Borgella

7   was being directed by Brutus."  Quote, "a merely speculative

8   logic cannot displace the need for evidence on such an issue

9   which cannot be decided by assumption or inference or not based

10  on facts," citing *U. S. versus Jordan*, Ninth Circuit, Fed. 3d --

11  291 Fed. 3d at 1091.

12          Continuing to read, because the record should state what

13  the contentions were, "The government initially suspected that

14  Borgella was the one who was directing Brutus.  Of course, it is

15  Borgella's best interest to now claim it was Brutus who was the

16  leader of this conspiracy.  However, Brutus still asserts that

17  it was Borgella who recruited him into this conspiracy and was

18  providing him with stolen checks.  Brutus also has no knowledge

19  of where the checks were coming from; whereas, Borgella by his

20  own statement, was the one directly working with those who were

21  attaining the checks."  I assume that was obtaining the checks.

22          "Brutus contends that Borgella was the one who

23  approached him about cashing checks -- about checking checks

24  because he knew that Brutus had cashed checks before.  Borgella

25  would tell Brutus that he was coming to drop the checks and

1   would wait for Brutus to cash the checks before departing with a
2   much larger share of the proceeds.  If anything, Borgella was
3   directing Brutus in this conspiracy rather than the other way
4   around.

5          "Brutus never claimed any right to a larger share of the
6   fruits of the crime.  Brutus received a minimal share of the
7   proceeds of these checks that were cashed.  When he sent the
8   money to the higher-ups in the conspiracy, he received less than
9   10 percent of the proceeds.

10         "Brutus never pinned or organized the activity.  He
11  always received the checks from others and cashed and returned
12  the checks to the organizers at their whim.  He had always had
13  instructions as to how to cash the checks and how to return the
14  proceeds and how much he could keep."

15         And concluding, "It is clear from the evidence that the
16  people who were providing the checks were the leaders or
17  organizers in this conspiracy and recruited others like Brutus
18  to cash the checks and keep a portion of the fee.  In this
19  conspiracy the higher-ups tried to limit their exposure by using
20  people like Brutus who would physically commit the criminal
21  activity and would be the ones to face the consequences about
22  the conspiracy should the conspiracy be discovered.

23         "There are certainly others involved in the conspiracy
24  who are responsible for all aspects of the organization and
25  direction of this crime and coordinating the theft, transferring

1  deposit of the checks so that this operation would run smoothly.

2  Brutus was simply one small part of this larger scheme."

3        Now, the probation officer's response in that -- who is

4  -- that's Mr. Pearce?

5        MR. PEARCE:  Yes, Your Honor.

6        THE COURT:  You have a written response here, but since

7  you are present, perhaps you should articulate what you found.

8  You may have a seat.

9        MR. PEARCE:  Your Honor, as it's noted in the addendum

10  there, the defendant -- based on the evidence that was presented

11  in the discovery information and speaking with the agents and

12  reviewing the case information, it was apparent that Borgella

13  was recruited into the conspiracy by Brutus.  Borgella was

14  directed by Brutus on when and how to bring the checks or mail

15  the checks from Florida to Georgia.  It was Brutus who operated

16  the Georgia portion of the conspiracy, in cashing the checks at

17  the convenience store.  It was Brutus who established the

18  convenience store as a location for cashing the checks.

19        Based on that information, I recommended that the

20  defendant receive a four-level enhancement for a role increase.

21        THE COURT:  Does the government wish to be heard or

22  submit any evidence on this part, Ms. Solari?

23        MS. SOLARI:  Your Honor, the government is prepared to

24  call Joyie Borgella.

25        THE COURT:  Do so.

1    MS. RODMAN:  And Judge, before we start, am I to --

2    THE COURT:  Yes.

3    MS. RODMAN:  Okay.

4    THE COURT:  Call the witness.

5    MS. SOLARI:  Government calls Joyie Borgella, Your

6  Honor.

7    THE DEFENDANT:  Excuse me, Your Honor.

8    MS. SOLARI:  I believe he's right outside the courtroom.

9    THE COURT:  Oh, okay.

10    THE DEFENDANT:  I'm sorry, but I would like to --

11    THE MARSHAL:  Stand up.

12    THE DEFENDANT:  Excuse me, I'm sorry.  I would like to

13  do the cross-examining since that is my right to do the

14  cross-examining of Mr. Borgella.

15    THE COURT:  Well, I'll consider that, but I'll hear his

16  testimony first.

17    THE CLERK:  Sir, if you would, please raise your right

18  hand, repeat after me.

19         JOYIE JEAN BORGELLA, being first duly sworn,

20  testified as follows:

21    THE WITNESS:  I do.

22    THE CLERK:  Please have a seat and the state and spell

23  your first and last name for the Court.

24    THE WITNESS:  My name is Joyie Jean Borgella, J-O-Y-I-E.

25  Middle initial J.  Last name B-O-R-G-E-L-L-A.

1                    DIRECT EXAMINATION

2     BY MS. SOLARI:

3     Q.   You are a co-defendant in the case with Mr. Brutus; is

4     that right?

5     A.   Yes, ma'am.

6     Q.   And you've entered a plea of guilty in this case?

7     A.   Yes, ma'am.

8     Q.   And that was to conspiracy and also to a charge of

9     delivering stolen U.S. Treasury checks?

10    A.   Yes, ma'am.

11    Q.   And there's a provision in your pretrial agreement that

12    says you will cooperate with the government?

13    A.   Yes, ma'am.

14    Q.   Are you testifying here today based on that provision in

15    your agreement?

16    A.   Yes, ma'am.

17    Q.   And now you know that you are obligated, of course because

18    you're under oath and pursuant to your plea agreement, to tell

19    the truth today?

20    A.   Yes, ma'am.

21    Q.   How long have you known Carlos Brutus?

22    A.   I've known Carlos since 1996.

23    Q.   When did you first learn of any sort of check-cashing

24    activity or check-cashing scheme as it pertains to this case?

25    A.   Back in February of 2012, last year.

1    Q.    How did that come about?

2    A.    I was actually staying with a friend of mine and Carlos

3    came to visit me, and he told me how he was coming up with a

4    scheme to cash --

5          THE COURT:  Where were you staying at that time?

6          THE WITNESS:  I was basically homeless.  A year before

7    that my apartment --

8          THE COURT:  But tell me where that was.

9          THE WITNESS:  Oh, Orlando, Florida.

10   BY MS. SOLARI:

11   Q.    So go on.  Describe the discussion you had with Mr. Brutus

12   at that time.

13   A.    He was telling me how that he came up with a scheme, how

14   he would cash fraudulent checks.  All I had to do was provide

15   him with some checks.  And --

16   Q.    What did he tell you about how this operation was

17   happening when you talked to him back in February of 2012?

18   A.    Well, he told me that give him a couple months and he

19   would come and basically tell me how everything was running and

20   tell me how to -- basically how the operation was going to run.

21   So he disappeared back in February, came back to me back in

22   April and bragged to me about how he was making money and he

23   saved up almost $80,000.

24   Q.    Did you believe him when he told you that?

25   A.    Not actually.  I thought it was a bunch of crock.  But at

1 the time I was -- I was in a rut, so I was waiting on my income

2 tax check, which was supposed to be about $4,800, and I asked

3 him if he would loan me about $4,500; and he was like, all

4 right, I'll do it, you just gotta get on the ball and find some

5 checks for me.

6      So he sent -- he wired me the money, and soon afterwards I

7 talked to my barber Jackie, and I told him about the situation.

8            THE COURT:  You talked to who now?

9            THE WITNESS:  My barber.

10            THE COURT:  Barber.

11            THE WITNESS:  Yes.

12            THE COURT:  Where did Brutus wire you the money that

13 you --

14            THE WITNESS:  Western Union, to Orlando, Florida.

15            THE COURT:  Where was he living?

16            THE WITNESS:  In Georgia.

17            THE COURT:  He was in Georgia.

18            THE WITNESS:  Hinesville, Georgia.

19            THE COURT:  So you got $4,500 by Western Union from

20 Brutus?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Do you remember the date?

23            THE WITNESS:  It was back in April.

24            THE COURT:  Go ahead, Ms. Solari.  I'm sure you're going

25 to cover all of this.

1    BY MS. SOLARI:

2    Q.    So in April of 2012 Mr. Brutus wired you $4,500?

3    A.    It was about 43.  Yeah.

4    Q.    Okay.  And was that to prove that he was in fact making

5    this money with these stolen checks?

6    A.    Yeah.  He caught my attention then.  And --

7    Q.    Well, let me ask you first, at that same time did he wire

8    money to anyone else in your family?

9    A.    Yes.  He also wired my father $10,000.  And he told me

10   that to pay him back $5,000.

11   Q.    Where is your father located or where was he at that time?

12   A.    He stays in Haiti.

13   Q.    So how did Mr. Brutus send him the money?

14   A.    He wired it to him.

15   Q.    So what agreement, if any, did you come to with Mr. Brutus

16   after he wired that money to you and your father?

17   A.    That sooner down the line after, you know, I got my income

18   tax checks and saved up enough money, that I would pay him back.

19   Q.    How were you supposed to get these checks?

20   A.    Well, Jack -- my barber basically got these checks from

21   other sources named Kesnel Livert and Reynault.

22   Q.    Kesnel Livert and someone named Reynault?

23   A.    Yes.

24   Q.    Do you know Reynault's last name?

25   A.    No.

1    Q.    All right.  Go on.  So Jackie got the checks.  Then what?

2    A.    And I was supposed to get it and mail it to Brutus UPS.  I

3    mean I was reluctant at the first idea of it, but he was like,

4    you know, he's been doing it for a while so I don't have nothing

5    to worry about.  So --

6    Q.    How did you know exactly where to mail the checks?

7    A.    He gave me the address and --

8    Q.    And how did you know to mail them UPS?

9    A.    He told me to go ahead and do it because he did it -- he

10   had his other sources do it a couple of times.  And --

11   Q.    So Mr. Brutus told you he was receiving stolen checks from

12   other sources as well?

13   A.    Yes.

14   Q.    Did you in fact mail any stolen Treasury checks to

15   Mr. Brutus?

16   A.    Yes.

17   Q.    Where did you mail them from?

18   A.    I mailed them from Orlando to Hinesville, Georgia, UPS,

19   under my name.

20   Q.    About when were you doing that?

21   A.    About maybe late April, May.

22   Q.    How many times did you mail Mr. Brutus stolen Treasury

23   checks?

24   A.    Maybe two or three times.

25   Q.    Was there a reason that you stopped mailing those checks?

1 A.    Yes.  He told me one of the packages that his sources had

2 mailed him had got picked up by the IRS and they started asking

3 questions.  So he told me that instead of me mailing them, he

4 actually wanted me to drive it down to Hinesville, Georgia from

5 Orlando.

6     I mean I was kind of scared at first, but he was like, you

7 know, you don't got nothing to worry about.  If you ever did get

8 stopped by the police, just tell them the truth, that you're

9 bringing these checks to Carlos Brutus who in turn has some type

10 of proper release form or some type of form where everything was

11 legit; I didn't have nothing to worry about, and he would pay

12 for gas and room and board and all that, so --

13 Q.    Did he give you money for gas and room and board?

14 A.    Yes.

15 Q.    Did Mr. Brutus ever tell you anything in particular about

16 where these checks should come from?

17 A.    Well, he told me to make sure that they stay away from

18 Miami, St. Pete and Tampa because of the fact that those checks

19 usually bounce, and if I can, make sure that they come from

20 Orlando.

21 Q.    Who would tell you when to drive the checks up from

22 Orlando to Hinesville?

23 A.    He would.

24 Q.    And did he tell you exactly where to go when you arrived

25 in Hinesville?

1  A.    Yeah.  He gave me an address, and at first his idea was to

2  -- he was going to buy another house, which he did.  And we were

3  never supposed to meet together, be together and have the checks

4  at the same time.  But that never happened.  So he always gave

5  me the address to his house, and I would put it in my GPS and

6  drive straight to his house and give him the checks there.

7  Q.    What would happen after you would give him the checks in

8  Hinesville?

9  A.    I would either go stay at a hotel for a couple of days or

10  I would stay at his house and wait for him to come back, and

11  then afterwards I would go back to Orlando.

12  Q.    All right.  Let's talk about what happened.  You said

13  you'd wait for Mr. Brutus to come back.  To come back from what?

14  A.    From cashing the checks.

15  Q.    Were you aware of where he was cashing the checks?

16  A.    From what I heard from what he told me, he was cashing

17  them at Heritage Bank with his other partner, Ok Cha.

18  Q.    Did you ever go with him and with Ms. Ok Cha to cash these

19  checks?

20  A.    No, ma'am.

21  Q.    So I assume at some point, though, you obtained some of

22  the proceeds from the checks?

23  A.    Yes.  At first he was getting 40 percent, but he gave me

24  10 percent out of his 40 for transporting the checks to him, and

25  Ok Cha got the rest -- I mean got the other 10 percent, and

1    everybody else got the remaining 50 percent.

2    Q.    All right.  I'm going to make sure I understand the

3    breakdown you said.  So 50 percent went where?

4    A.    Went to proceed -- I meant to the sources in Orlando.

5    Q.    Okay.  And then what was your percentage for bringing

6    them?

7    A.    10 percent.

8    Q.    And what percentage did Mr. Brutus tell you Ok Cha

9    retained?

10   A.    10 percent.

11   Q.    And what percentage did Mr. Brutus keep according to him?

12   A.    He would keep 30 percent because of the fact that even

13   though they don't bounce, but they usually did, and if they did,

14   he would have enough money saved up so he could pay back the

15   checks that did bounce.

16   Q.    So any checks that were bad he had to pay Ms. Ok Cha for

17   those?

18   A.    Yes.

19   Q.    Did Mr. Brutus ever tell you whether he had any trouble at

20   Ok Cha's store or whether she was ever concerned about cashing

21   those checks?

22   A.    I remember him telling me one time that her husband wanted

23   him to -- to close down the operation.  But I guess he talked to

24   her husband and -- to her and her husband, and I don't know what

25   they talked about, but I think he probably told her something

1    she wanted to hear and she continued with the -- with the

2    operation.

3    Q.    So he persuaded her to keep cashing the checks then?

4    A.    Yes, ma'am.

5    Q.    And I'd just like to be clear about how many folks, that

6    you're aware of anyway, who are involved in this operation.  So

7    there's obviously you and Mr. Brutus.

8    A.    Yeah.  Me and Mr. Brutus, Jackie, and the other two that

9    he was getting his checks from; and the last time that I drove

10   up to Hinesville, Georgia, I received checks from Ranet Grever.

11   Q.    Ranet Grever.  Who is Ranet Grever?

12   A.    He was actually the friend that I was staying with back

13   when Carlos met me at the time.

14   Q.    Okay.  So there was you, there was Mr. Brutus; there was

15   Reynault, there was Jackie.  There was Kesnel Livert?

16   A.    Kesnel Livert.

17   Q.    Okay.  And now there was --

18   A.    Ranet Grever.

19   Q.    Ranet Grever?

20   A.    Correct.

21   Q.    And then, of course, Ms. Ok Cha as well?

22   A.    Yes, ma'am.

23   Q.    Okay.

24        MS. SOLARI:  I'll pass the witness, Your Honor.

25        THE COURT:  Ms. Rodman.

1    MS. RODMAN:  Judge, I'm prepared for cross-examination.

2  My client is still saying that he would like to --

3    THE COURT:  You go ahead.  I do note this.

4    THE DEFENDANT:  I object to that because I have a right

5  to --

6    THE COURT:  Have a seat.

7    THE DEFENDANT:  I have --

8    THE MARSHAL:  Sit down.

9    THE DEFENDANT:  They're breaking my constitutional right

10 to represent myself.

11    THE MARSHAL:  Hush.

12    THE DEFENDANT:  I have a constitutional right to

13 represent myself.

14    THE COURT:  Go ahead, Ms. Rodman.  If he will not behave

15 himself, I'll take other actions.

16                  CROSS-EXAMINATION

17 BY MS. RODMAN:

18 Q.   Mr. Borgella, you've cashed checks before, have you not?

19 A.   Yeah.  You mean like when I got paid from --

20 Q.   Prior to being contacted by Mr. Brutus.

21 A.   I've cashed like legit checks from work, yes, ma'am.

22 Q.   In a conspiracy-type setting you have cashed other checks;

23 correct?

24 A.   Never.

25 Q.   So you're telling me that Mr. Brutus just contacted you

1    out of the blue, you of all people, to be involved in this

2    particular conspiracy?

3    A.    Yeah, because at the time I was basically homeless, living

4    off unemployment, and he didn't like my living conditions.  And

5    he was like, well, I'm going to try to help you out.  I got this

6    scheme that's going to work, and you could possibly make money

7    after everything gets done with.

8    Q.    He didn't know of you to ever have been involved in any

9    other conspiracies --

10   A.    No.

11   Q.    -- that involved check cashing?

12   A.    No.  No.

13   Q.    Now, you said that the sources were getting 50 percent?

14   A.    Yes, ma'am.

15   Q.    And that Mr. Brutus was getting 30 percent?

16   A.    Yes, ma'am.

17   Q.    How much did you say you were getting again?

18   A.    I was getting 10 percent for transportation.

19   Q.    Okay.  So the sources were the ones that were getting the

20   bulk of the profit from this?

21   A.    Yes, ma'am.

22   Q.    Okay.  You talked about some other people that were

23   involved.  You said that you knew this Jackie and this Grever.

24   Did you ever meet any of the other people that were providing

25   the checks?

1  A.    No.  I just asked Jackie where was he getting the checks

2  from, and then he named -- those are the names that he gave me.

3  Q.    Okay.  You never -- you never had any sort of contact with

4  those people at all?

5  A.    No.

6  Q.    Okay.  And you're going to be -- you're doing this

7  testimony in order to get some credit in this case; is that

8  correct?

9  A.    Well --

10  Q.    Is that the reason you're coming forward now to speak

11  about this issue?

12  A.    Yes.

13  Q.    And you didn't let the government know any of this

14  information until February?

15  A.    Until -- yes.  That's the first time I actually talked to

16  anyone because the first time I didn't have my lawyer, and I

17  didn't want to talk to nobody without my lawyer around.  So as

18  soon as I got my lawyer and I was comfortable to talk, I asked

19  my lawyer to, you know, go ahead --

20  Q.    You did initially refuse to speak to the government;

21  correct?

22  A.    When I first got arrested, yes, because I didn't have no

23  lawyer around.

24  Q.    Okay.  What kind of -- what kind of directions was

25  Mr. Brutus giving you in this case?

1  A.    Well, basically --

2  Q.    You talked about him recruiting you, but what kind of

3  directions did he give you?

4  A.    Basically he directed that I send them UPS under my name,

5  that I didn't have nothing to worry about, which I was very

6  reluctant to, but he made it seem like it was going to be a

7  breeze.

8        Then he also told me that he wanted me to start driving

9  from Orlando to Georgia, and basically told me that make sure

10 that the checks don't come from St. Pete, Tampa or Miami because

11 those checks usually are the ones that bounce and he didn't want

12 to end up paying the bulk of the checks basically.  So he would

13 rather them come from Orlando.

14       He told me if I ever got stopped by the police, that I

15 didn't have nothing to worry about, to tell them the truth, that

16 I was bringing the checks to him, that he had a legit

17 check-cashing business.

18 Q.    And did he tell you that that was how this conspiracy

19 typically worked prior to your involvement?

20 A.    I mean I didn't know the ins and outs, no.  I didn't know

21 the ins and outs of the whole operation.  I just -- I didn't

22 even know how it worked.  I just knew that somehow some way that

23 him and his partner -- I mean the Ok Cha lady -- I mean Ok Cha

24 cashed the checks at the bank.

25            MS. RODMAN:  Okay.  I think that's all I have, Judge.

1        THE COURT:  Okay.  Yes.  You may stand.  What is it?

2        THE DEFENDANT:  I would like to apologize, Your Honor,

3   for the last situation that just happened, but I would like to

4   utilize my constitutional right to represent myself --

5        THE COURT:  What would you ask him?

6        THE DEFENDANT:  I have the questions right here to ask

7   him, Your Honor.

8        THE COURT:  I said what would you ask him.

9        THE DEFENDANT:  I have several questions to ask him.

10       THE COURT:  All right.  Tell me the first one.

11       THE DEFENDANT:  My first question would be to

12  Mr. Borgella is --

13       THE COURT:  No.  You just tell it to me.

14       THE DEFENDANT:  Fine, Your Honor.  My first question

15  would be to Mr. Borgella is, can you explain your part in the

16  conspiracy?  Just a short summary.  That would be my first

17  question.

18       THE COURT:  What would be the next question?

19       THE DEFENDANT:  My next question is, how much were you

20  getting paid?

21       THE COURT:  The next question.

22       THE DEFENDANT:  You were charged with over a million

23  dollars in this check-cashing conspiracy, but Mr. Borgella,

24  isn't in reality you were not even -- you didn't cash anything

25  close to a million dollars?

1          THE COURT:  And the next question.

2          THE DEFENDANT:  Is it not true that you took a plea to

3    these charges because you thought Mr. Brutus would implicate you

4    for a million dollars in this check-cashing conspiracy?

5          THE COURT:  And the next question.

6          THE DEFENDANT:  Next question would be, let me ask you,

7    is it a fact that -- did you not -- that if you did not come

8    down to Hinesville, Georgia, that you would not be sitting in

9    this courtroom today?

10         THE COURT:  And the next question.

11         THE DEFENDANT:  Do you feel that the district attorney's

12   office forced you into a plea of guilty because they threatened

13   you with a lot of time?

14         THE COURT:  Do you feel you were forced into pleading

15   guilty?

16         THE WITNESS:  No, sir.

17         THE COURT:  All right.  Go ahead.  Next question.

18         THE DEFENDANT:  You really wanted to take this to trial

19   because you felt that the charges against you were false.  That

20   would be my --

21         THE COURT:  Right.  Okay.

22         THE DEFENDANT:  Okay.  My next question after that would

23   be have you ever met Ms. Ok Cha Mobley.

24         THE COURT:  Go ahead.  Next question.

25         THE DEFENDANT:  Your Honor, I know I'm asking these

1  questions, but it's unfair because he's not being able to

2  respond.

3      THE COURT:  I understand that.

4      THE DEFENDANT:  And I feel that my constitutional rights

5  are being violated, once again.

6      THE COURT:  Well, you'll have some time to discuss it.

7  Go ahead with your next question.

8      THE DEFENDANT:  My next question would have been do you

9  think you are being wrongly accused of a million-dollar

10  check-cashing scheme.

11      THE COURT:  Next question.

12      THE DEFENDANT:  My next question would be, Mr. Borgella,

13  even though the DA brought you as their witness, do you feel

14  that this case is based on lies and bad evidence?  That would be

15  my next question.

16      THE COURT:  All right.

17      THE DEFENDANT:  My next question would be, did the

18  district attorney's office coach you on what to say because if

19  you didn't say what would be in their best interest, you thought

20  Mr. Brutus would be used against you to hurt you in this case,

21  in your case when you get charged.

22      THE COURT:  I understand.

23      THE DEFENDANT:  And my next question would be did you

24  really know Mr. Kesnel Livert, which is critical to this case,

25  because he's stating that he knows Mr. Kesnel Livert, which I

1    know that he doesn't.

2         THE COURT:  Go ahead.  Next question.  Is this person,

3    Livert, a part of the conspiracy as identified by the

4    government?

5         MS. SOLARI:  Your Honor, we believe that he was one of

6    the sources of checks, but he's not named in the indictment and

7    not in fact critical to the case.

8         THE COURT:  Next question, Mr. Brutus.

9         THE DEFENDANT:  My next question would be, would be,

10   what businesses does your father own, because Mr. Borgella

11   claimed that he was poor and broken, that I owed him money and I

12   loaned that money to his father, and he wanted to -- if I could

13   be correct, he said that he wanted me to -- it's basically it's

14   a lie.  So he said he wanted me to pay back that money or he was

15   trying to pay me back that money by working for me.

16        THE COURT:  Okay.

17        THE DEFENDANT:  How can -- my next question would have

18   been, how can you claim that Mr. Borgella -- Mr. Livert gave him

19   those checks when in reality --

20        THE COURT:  I think I get this.  Now, I want to remind

21   you, and I'm reading again from the transcript, Mr. Brutus.  I

22   told you back in January 16th, "Mr. Brutus, I know nothing about

23   you or the case.  I read the indictment when it came in, but

24   I've not talked to your lawyer or the prosecutor or any of the

25   agents or anyone else.  I do not know whether the government can

1    prove its case against you, and I do not know whether you have

2    any defenses to these charges.  So I voice no opinion either

3    way.  But if you plead guilty here today, if I accept your plea,

4    you will be giving up all of your defenses, do you understand

5    that?"  "Yes, Your Honor."

6         Question:  "And in all likelihood you're forever going

7    to lose your right to complain on appeal about anything that

8    occurred in this case, that is, the way and manner that the

9    government went about obtaining the evidence against you, who

10   they talked to and how they accumulated the evidence -- I do not

11   know which agency it is -- who was on the grand jury and how

12   they went about discharging their duty is also sometimes called

13   into question.  But you're giving up your right to attack that.

14        "The Department of Justice prosecutes cases for the

15   United States.  The United States Attorney's Office is the arm

16   locally that does that.  They accumulate the evidence.  They put

17   it into a form and present it to the grand jury.  And you give

18   up your right to complain, in all likelihood, about anything

19   they've done or anything that the Court has done.  That would

20   include the judge, the magistrate judge that appointed your

21   lawyer and handled the case before today in large measure.

22        "And more importantly, you give up your right to

23   complain about what your lawyer did or did not do in this case.

24   You understand that?"

25        "Yes, Your Honor."

1    "Now, Mr. Brutus, I've given you these various agencies

2    and individuals, and I identified them for you.  Do you honestly

3    and conscientiously have any complaint about the way you have

4    been treated, the way you've been represented or any other

5    aspect of this proceeding?"

6    "No, Your Honor."

7    "Now, have you told your lawyer the truth?"

8    "Yes."

9    "Did you understand that what you told her would remain

10    between the two of you unless you gave her your prior consent

11    for her to divulge it?"

12    "Yes."

13    "THE COURT:  Ms. Rodman, will you review in the presence

14    of your client what you've done in order to ensure the adequacy

15    of your representation."

16    "MS. RODMAN:  Well, initially we received the discovery

17    from the government.  We went over the discovery."

18    "Okay.  When did you first see him?"

19    "MS. RODMAN:  I first saw him, I believe it was shortly

20    before or shortly after our initial appearance in court."

21    "THE COURT:  Did you have a chance to confer with him?"

22    "Yes, we did."

23    "THE COURT:  And was that in private?"

24    "MS. RODMAN:  It was."

25    "THE COURT:  And then the government gave you

1  discovery?"

2       "MS. RODMAN:  That's correct."

3       "THE COURT:  Ms. Solari, was she furnished open-file

4  discovery?"

5       "MS. SOLARI:  Yes, Your Honor.  The defense has the

6  entire content of our evidentiary file."

7       By the Court, to Mr. Brutus:  "Do you understand what

8  discovery is?"

9       "Yes, Your Honor."

10      Question:  "That's all of the government's records and

11  so forth that they can get, and you get it piecemeal, but they

12  gave it to her, and did you go over that with her?"

13      "Yes, Your Honor."

14      "Did you have a chance to ask her questions about it?"

15      "Yes, Your Honor."

16      "Did she explain what all of this meant?"

17      "Yes."

18      "Did she go over what would transpire in a trial?"

19      "Yes."

20      "Did you want her to interview any witness that you

21  didn't already have the information from them?"

22      "No."

23      "What else did you do, Ms. Rodman?"

24      "We went over the Sentencing Guidelines, tried to

25  determine the approximate sentencing range.  Of course, we don't

1  know exactly what the range will be.  And we went over that.  We

2  talked to the government."

3      "By the Court:  Did you give your consent to your lawyer

4  to negotiate or talk to the prosecutor?"

5      "Yes, I did."

6      Question:  "Did she in any way try to coerce you into

7  giving a plea or allowing her to talk to the government?"

8      "No."

9      Then back to Ms. Rodman:  "We did meet with the

10  government on one occasion, and Mr. Brutus furnished cooperation

11  to the government at that time.  We met on eight occasions to go

12  over it."

13      "You and your client?"

14      "Yes.  To go over the plea agreement that would be

15  discussed at the change-of-plea hearing today as well."

16      By the Court to Mr. Brutus:  "Did she do all of that,

17  Mr. Brutus?"

18      "Yes."

19      "Was there anything that you asked her to do or you

20  thought that she should have done that she did not in fact do?"

21      "No, Your Honor, she did everything."

22      "Are you satisfied with your lawyer and the way she

23  represented you in this case?"

24      "Yes."

25      Question:  "Now, when you get to prison, the first thing

1    you're going to see is a bunch of people attacking their lawyer.

2    They will file writs, my lawyer was no good.  If my lawyer had

3    done this or that or not done this or that, I wouldn't be in

4    prison.  You understand that?"

5            "Yes, Your Honor."

6            "I interrogate you on that point because if you file

7    those motions before me now, they will go in the trash can, you

8    understand?"

9            "Yes."

10           "So that's the reason I'm somewhat zealous in trying to

11   determine whether or not you have any complaint about anything

12   that was done or not done by anyone associated with this case.

13   Do you?"

14           "No."

15           "All right.  And you've had enough time to talk with

16   your lawyer?"

17           "Yes."

18           "And you know what the charges are in the indictment?"

19           "Yes."

20           "Then I will go into those and explain the essential

21   elements."

22           So Mr. Brutus, you didn't have to wait to get to prison

23   to start attacking your lawyer, but I think that the record is

24   replete.

25           Does the government have any more questions from the

1  witness?

2      MS. SOLARI:  Not for this witness, Your Honor.

3      THE COURT:  The witness may step aside.

4  Cross-examination disallowed.  You may have a seat, Mr. Brutus.

5      MS. SOLARI:  Your Honor, the government would also like

6  to call Special Agent Adam Rogalski.

7      THE COURT:  Please do so.

8      Yes, Mr. Brutus.  Stand.  What is it?

9      THE DEFENDANT:  Yes, I would like to, once again, ask

10  the right to cross-examine after Ms. Solari is done with Agent

11  Adams, to cross-examine him, once again.  I would like to

12  exercise my right once again.

13      THE COURT:  Denied.

14      THE CLERK:  Please raise your right hand.

15              ADAM ROGALSKI, being first duly sworn,

16  testified as follows:

17      THE WITNESS:  I do.

18      THE CLERK:  Please have a seat.  State and spell your

19  first and last name for the record.

20      THE WITNESS:  My name is Adam Rogalski.  First name is

21  spelled A-D-A-M.  Last name spelled R-O-G-A-L-S-K-I.

22              DIRECT EXAMINATION

23  BY MS. SOLARI:

24  Q.   Where are you currently assigned?

25  A.   The Savannah resident agency.

1  Q.    Are you the case agent handling this investigation?

2  A.    I am.

3  Q.    And have -- in the course of your investigation, have you

4  interviewed Mr. Brutus?

5  A.    I have, yes.

6  Q.    Did those interviews take place, the first one, on

7  approximately July 19th of 2012?

8  A.    Yes.

9  Q.    The second one on or about October 1st of 2012?

10  A.    Yes.

11  Q.    The third on or about October 25th of 2012?

12  A.    Yes.

13  Q.    And also a proffer interview on the 7th of December of

14  2012?

15  A.    Yes.

16  Q.    So then it would be fair to say you're familiar with the

17  facts of this case?

18  A.    I am, yes.

19  Q.    I'd like to talk to you about the persons involved in this

20  conspiracy.  Based on your conversations with Mr. Brutus, who

21  did he tell you was involved in this check-cashing conspiracy

22  either as sources, delivery people, anything at all?

23  A.    According to Mr. Brutus, he had three sources of checks

24  located down in Florida; the co-defendant, Mr. Borgella, an

25  individual by the name of Kesnel Livert, an individual by the

1  first name of Reynault, last name unknown.

2      Mr. Brutus also indicated that the check-cashing business

3  he was utilizing was ran by a woman named Ok Cha Mobley in

4  Hinesville, Georgia.  She was also involved in the scheme.

5  Q.  Have you met with and spoken to Ms. Ok Cha Mobley?

6  A.  I have.

7  Q.  We'll get to that in a moment.  With regard to verifying

8  the existence of any of the other persons he mentioned, what

9  efforts did you take and what were the results?

10  A.  I attempted to locate all the individuals.  And I did

11  locate Mr. Kesnel Livert, who is a real person located down in

12  Orlando, Florida.

13  Q.  And did you find him somewhere near where Mr. Brutus said

14  he would be?

15  A.  Yes.

16  Q.  Let's talk about Ms. Ok Cha Mobley.  What's the nature of

17  her occupation or business?

18  A.  Ms. Mobley owns a convenience store and also a

19  check-cashing business in Hinesville, Georgia.  Mr. Brutus was

20  bringing her all of these stolen Treasury checks to cash at her

21  store.  She had a license through the state of Georgia to cash

22  checks.

23      Mr. Brutus brought her all of the stolen Treasury checks.

24  She would in turn take them to Heritage Bank in Hinesville,

25  Georgia, cash them in her account at Heritage Bank, bring them

1   back to her store and pay the proceeds to Mr. Brutus.

2   Q.   Based on your conversations with Ms. Mobley and

3   Mr. Brutus, what evidence, if any, did Ms. Ok Cha have that this

4   was a fraudulent check-cashing scheme?

5   A.   Ms. Ok Cha was aware that the checks were fraudulent, or

6   at least was woefully blind to the fact of their illegality.

7        Ms. Mobley knew that Mr. Brutus was bringing the checks up

8   from Florida, that Mr. Brutus was not the payee on any of the

9   checks, nor did Mr. Brutus know the payee on any of the checks.

10       She was instructed by Mr. Brutus to take a commission for

11  herself for cashing the checks and was given at some point in

12  the conspiracy power of attorneys from Mr. Brutus which were

13  clearly fraudulent, signed by Mr. Brutus and with the same

14  fraudulent notary power of attorney on all of those.

15  Q.   Did you come across any evidence to suggest why Mr. Brutus

16  suddenly started providing these forged powers of attorney to

17  Ms. Mobley?

18  A.   At some point over the summer of 2012 several of the

19  checks that Mr. Brutus brought to Ms. Mobley had bounced, either

20  were not legitimate checks or had insufficient funds.

21  Mr. Brutus repaid Ms. Mobley for those checks.

22       At that point Ms. Mobley's husband became very suspicious

23  of the scheme and wanted to make sure that Ms. Mobley was

24  protecting herself.  At that point her and Mr. Brutus devised a

25  plan where Mr. Brutus was going to provide these fake power of

1    attorneys to give them coverage in case the scheme was

2    uncovered.

3    Q.    Were all of the checks already endorsed when Mr. Brutus

4    presented them to Ms. Mobley?

5    A.    No, they were not.  Mr. Brutus endorsed several of the

6    checks himself with fake signatures in front of Ms. Mobley.

7    Q.    And did Ms. Mobley talk to you about whether she ever

8    looked at the powers of attorney and the checks themselves to

9    confirm whether the names were even the same?

10   A.    She never did.  In fact, on a lot of the checks on the

11   power of attorneys the names were completely different.

12   Q.    And you mentioned that some of the checks actually bounced

13   back from the bank as being counterfeit Treasury checks; is that

14   right?

15   A.    Yes.

16   Q.    Did Ms. Mobley contact law enforcement on any of those

17   occasions?

18   A.    No, she never did.  Ms. Mobley only contacted the

19   Hinesville Police Department and thereafter the FBI after

20   Heritage Bank shut down her account and tried to reclaim all the

21   money from Ms. Mobley.

22   Q.    And there was some mention, I believe by Mr. Brutus this

23   morning, about wire transfers.  Did you actually obtain evidence

24   regarding any wire transfers made by Mr. Brutus in April and May

25   of 2012?

1  A.    Yeah.  Through subpoena we did obtain some of Mr. Brutus'

2  wire transfers, and I can confirm the wire transfers to

3  Mr. Borgella for the $4,300 and to Mr. Borgella's father for the

4  $10,000 in Haiti.

5         MS. SOLARI:  Thank you.  I'll pass the witness, Your

6  Honor.

7         THE COURT:  Ms. Rodman.

8                      CROSS-EXAMINATION

9  BY MS. RODMAN:

10 Q.    Okay.  So we discussed several people in this case.  We've

11 heard from Borgella.  You said that you spoke to this Kesnel

12 Livert and you found him in Florida; is that correct?

13 A.    I did not speak with him, no.

14 Q.    Oh, you did not speak to him.

15 A.    I did identify a person by the name of Kesnel Livert in

16 Orlando, Florida, but was unable to speak with him.

17 Q.    So you haven't been able to determine at this point

18 whether he had any involvement in this case?

19 A.    Only from the admissions of Mr. Brutus and Mr. Borgella.

20 Q.    Okay.  And then we also discussed a Reynault.  We don't

21 know anything about him?

22 A.    No further information besides the name Reynault provided

23 by Mr. Brutus and Mr. Borgella.

24 Q.    Okay.  We're not even sure if he's a real person?

25 A.    I am not sure.

1   Q.   Okay.  And then you also indicated that you spoke to

2   Ms. Mobley, who ultimately wasn't indicted in the case;

3   correct?

4   A.   Correct.

5   Q.   Okay.  When you spoke to her, did she indicate to you that

6   she knew that there was a conspiracy going on at any point?

7   A.   She did not.  Ms. Mobley knew that she had done wrong, but

8   she did not indicate that there was a conspiracy.

9   Q.   Okay.  Did she actually admit to you that she was in the

10  wrong in this, that she was -- had done something that was

11  illegal?

12  A.   No.  She understood that all of the checks that she had

13  cashed were fraudulent and fake, but as far as admitting she did

14  something illegal, no.

15  Q.   Okay.  And is it fair to say this case is still under

16  investigation?

17  A.   For the most part the investigation is closed.  There are

18  several, you know, outstanding leads as far as trying to

19  identify the people to further expand different investigations,

20  but as far as the present investigation conspiracy, no, I

21  consider it closed.

22  Q.   There's a lot of things that are still unknown in this

23  case?

24  A.   Only several things, as you mentioned, identifying who

25  these actual individuals were and where the original source of

1  the checks were.

2  Q.   Right.  You don't know where the checks came from, how

3  they were stolen, where they were taken from, anything like

4  that?

5  A.   No.  They're stolen United States Treasury checks, but as

6  far as where they were stolen from, I do not know.

7  Q.   Okay.  So is it fair to say there may be many people

8  involved, there may be no one else involved; you just don't

9  know?

10 A.   There may or may not be.

11 Q.   Okay.  Now, Mr. Borgella spoke today about Mr. Brutus

12 recruiting him into this.  Isn't it also true that Mr. Brutus

13 had a proffer back in December, I believe, in which he said the

14 exact opposite, that Mr. Borgella had recruited him into this

15 conspiracy?

16 A.   That's what Mr. Brutus said, yes.

17 Q.   Okay.  And so basically the only evidence that we have

18 here is that, you know, what Mr. Borgella is saying versus what

19 Mr. Brutus is saying?

20 A.   That is true, but I was present for a phone conversation

21 between Mr. Brutus and Mr. Borgella in which Mr. Brutus did ask

22 Mr. Borgella to send some checks up and in fact instruct him to

23 do so.

24      MS. RODMAN:  Okay.  I think that's all I have, Judge.

25      THE COURT:  Now, you may stand and tell me what

1    questions you would ask of the witness if I were to allow them.

2         THE DEFENDANT:  My first question would be to Agent Adam

3    would be -- my first question would be can you tell me a little

4    bit about yourself and your experience as an FBI agent?  That

5    would be my first question.

6         THE COURT:  Next question.

7         THE DEFENDANT:  My second question would have been, if I

8    had been allowed to utilize my right to cross-examine the agent,

9    would be, can you give me a summary of how you marked,

10   identified and gathered all the physical evidence in this case?

11        THE COURT:  And the next one.

12        THE DEFENDANT:  My third question would be, can you

13   describe what a power of attorney is and its functions?

14        THE COURT:  And the next one.

15        THE DEFENDANT:  My fourth question would be, what is

16   your understanding based solely on your investigation of why

17   would Ms. Mobley cash over a million dollars in checks without

18   any forms of I.D. or documentation from the defendant?

19        THE COURT:  And the next one.

20        THE DEFENDANT:  My next question would be, based solely

21   on your experience -- on your expertise and experience in the

22   field of evidence, have you ever seen situations in which an

23   accused criminal or perpetrator or suspect was motivated to

24   dispose of physical evidence when that evidence might link them

25   to a crime?

1          THE COURT:  And the next one.

2          THE DEFENDANT:  Other than the power of attorney, there

3   is no other way to link Mr. Brutus to the checks physically;

4   correct?

5          My next question would have been, is there any videotape

6   or phone recordings that place Mr. Brutus with Ms. Mobley giving

7   her the checks?

8          My next question after that, Your Honor, would be, so

9   you cannot place the defendant with Ms. Mobley cashing checks

10  other than the power of attorneys linked to Mr. Brutus?  That

11  would have been my next question.

12         THE COURT:  Okay.

13         THE DEFENDANT:  My next question after that would have

14  been, do you know of a Detective Al Cato from Hinesville Police

15  Department?  And I would have asked the agent, can you explain

16  Mr. Cato's involvement in this case?

17         THE COURT:  Next question.

18         THE DEFENDANT:  My next question would be, did Mr. Cato

19  not explain to you that Ms. Ok Cha Mobley has had many

20  encounters with her business involving check fraud with the

21  Hinesville PD before this court case?

22         My next question would have been, to the best of your

23  recollection there is only 37 powers of attorneys in this case

24  that you guys have in evidence.  That would have been my next

25  question.

1      THE COURT:  Okay.

2      THE DEFENDANT:  My next question after that would be, so

3   it is fair to say that the government in reality only has 37

4   checks linking Mr. Brutus to this conspiracy.

5      THE COURT:  All right.  I quote further -- none of those

6   will be allowed.  58, Page 58, after all the colloquy, you said,

7   "Yes, Your Honor, I'm admitting that I'm fully guilty of

8   everything.  I was just saying that some of the parts were left

9   out."

10      "Well, okay, but remember, the Sentencing Guidelines

11   call for candor, acceptance of responsibility.  I don't want you

12   to accept any responsibility for anything you did not do.  But

13   you can't skate around on me and just say I did it but not

14   disclose what."

15      "No, Your Honor, I accept acceptance of responsibility

16   for everything that the agent had said.  Just some things were

17   left out."

18      "Okay.  But there was a time when you knew it was an

19   illegal scheme and that you were cooperating or working with

20   someone else to defraud the government?"

21      "Yes, Your Honor.  I accept full responsibility of

22   that."

23      And I -- then I accepted the factual basis for the plea

24   and told you once again that you were giving up your right to

25   trial.  So we shall not beat this anymore.

1     Thank you.  You were completed with the witness?

2          MS. SOLARI:  Yes, Your Honor.

3          THE COURT:  All right.  Any other evidence on that

4     point?

5          MS. SOLARI:  No, sir, Your Honor.

6          THE COURT:  Now, the Court was in the sentencing

7     process.  As to the question of guideline application, with

8     respect to the conclusion contained and which exceptions were

9     made, that is, Paragraph 42, the role enhancement, and after

10    considering the objections, the evidence that has been raised

11    and presented, the Court concurs most adamantly with the

12    findings in the presentence report, including the addendum.

13         The applicable Advisory Guidelines are thus:  There's a

14    total offense level of 39, a criminal history category of I,

15    indicating 262 to 327 months of imprisonment, two to five years

16    of supervised release, 25,000 to $1,000,000 fine; $1,210,410

17    restitution.  Has that been amended?

18         MS. SOLARI:  I believe it has, Your Honor.  Officer

19    Pearce can address that.

20         MR. PEARCE:  Your Honor, the presentence report has not

21    been amended.  That is the current restitution total as of last

22    contact with the victim.

23         THE COURT:  All right.  And there calls for a $200

24    special assessment.  The Court notes that as to Count 1 there's

25    no minimum mandatory; there's a maximum of five years'

1  imprisonment.  As to Count 100 there's no minimum mandatory;

2  there is a maximum of 30 years' imprisonment.

3       Now, does defense counsel wish -- or defendant -- wish

4  to make any statement or present any information in mitigation

5  of sentence?

6       MS. RODMAN:  Mr. Brutus does.

7       THE COURT:  I'll give him a chance to also present

8  anything that he wishes in mitigation or to make any statement.

9  Counsel may go first -- well, I'll ask him in this unique case

10 to -- you understand what you may do, Mr. Brutus?

11      THE DEFENDANT:  Can you repeat that?

12      THE COURT:  Come up to the lectern.  Tell me anything

13 you wish the Court to know.  You may present any information in

14 mitigation also.  You may call witnesses, only on the question

15 of mitigation.  So go ahead.

16      THE DEFENDANT:  Your Honor, today I had -- my case was

17 prepared.  I felt that I was given ineffective assistance of

18 counsel in this case.  I was not allowed to utilize my right to

19 represent myself today.

20      THE COURT:  Okay.  We've already covered that.  I will

21 be sentencing you in a few minutes.  If you wish to discuss

22 anything about yourself or what the sentence should or should

23 not be, this is the appropriate time.  You have full range, and

24 the Court is prepared to listen to you.  On the legal issues of

25 ineffective representation, I have ruled on that.  The record is

1   here.

2           THE DEFENDANT:  Yes.

3           THE COURT:  So you may pass on by that.  You've

4   preserved your error.  So go ahead and we'll discuss mitigation

5   or your role in the offense or anything of that nature that you

6   wish to say.

7           THE DEFENDANT:  Yes, Your Honor.  Today I'm being

8   charged for a million dollars in check-cashing conspiracy.  I

9   was not the leader of this conspiracy, and I did not direct

10  Mr. Borgella or Ms. Ok Cha in this conspiracy.  Only -- in

11  actuality, only 37 checks can be linked to me.

12          As this is a conspiracy, I understand that when you're

13  in a conspiracy, any part of that conspiracy that you're guilty

14  for, therefore, you're guilty of that million-dollar conspiracy.

15  But because of the PSI not having Ms. Ok Cha Mobley on the case,

16  I believe that the truth and his point of view is supposed to

17  give you a neutral point of view for the Court, it was kind of

18  shifted because it couldn't be done.

19          My role in this case, yes, I cashed checks for Ms. Ok

20  Cha Mobley.  Were they over a million dollars?  No.  I have very

21  much a lot of evidence that I can prove to use that.

22          If I would have went to trial and if I would have known

23  my constitutional right to trial, I would have used that to look

24  for a search for the truth, and that's what a trial is, and I

25  wasn't given that today.

1      I understand that I'm guilty.  I believe in

2 accountability, but I want to be accountable for what I did

3 wrong in this case.

4      THE COURT:  Well, tell me what you did wrong and what

5 you -- how the presentence report has misevaluated it.

6      THE DEFENDANT:  The presentence report has misevaluated

7 the fact that Ms. Ok Cha Mobley had evidence -- the prosecutor

8 brought evidence of a million dollars in checks.  Only 37 of

9 those checks can be linked to me with the power of attorney.

10      I'm the only one being charged with leadership in this,

11 and not only -- not only is that a factor, it comes down to the

12 victims also.

13      The max of that conspiracy is only five years.  Then

14 there is one count of bank fraud, and the max of that is 30

15 years.  There's several, several white-collar crime cases

16 throughout that are known that nobody that I know have gotten

17 sentenced are looking at 20 years of their life being taken away

18 because of a conspiracy.  And I'm the only one being charged

19 with it today.

20      Am I guilty?  Yes.  Do I deserve to do 10 years?  Yes.

21 Do I deserve to do 20 years?  No.  And that is my opinion, and I

22 feel that I've never been in trouble.  I've served my country,

23 and I could have died in Iraq last year, and nobody would have

24 been here and nobody would have said anything.  You would have

25 looked at me as a hero, but I made a mistake, and I don't have a

1  problem with that because I'm fully military, but I don't

2  appreciate the fact that Mr. Pearce said that I committed

3  espionage in this courtroom, and I just don't think that's right

4  because I gave my life for my country.

5        And Your Honor, I'm not looking for a way out or to use

6  Ms. Rodman as a scapegoat, but one thing I know for certain is I

7  don't believe that 20 years of my life should be taken away when

8  the same terrorists look at 20 years of their life being taken

9  away.  Child molesters don't even get 20 years, and I'm getting

10 20 years for a million dollars in checks that I only saw maybe

11 $100,000 of that, and I don't think that's right.

12       Mr. Borgella is outside, and he's looking at only five

13 years.  I fully cooperated with the FBI all the way through.

14 What the FBI is leaving out is that while I was in jail, if he

15 can say that before this case even happened, I was the first

16 person to come to law enforcement.  I was the first person to

17 give more than $14,000 in checks to the IRS agents before they

18 even had a case.  In actuality, I was the first person to bring

19 those checks in Hinesville to the Liberty County Police

20 Department, me, Mr. Brutus, before any charges were brought

21 before me, and that is not being stated today.

22       And I have -- I can totally -- Your Honor, I know your

23 reputation.  Your reputation is known throughout the federal

24 court system that you're a strict judge, but you're also a fair

25 judge, and today that's why I wanted to go to trial so all the

truth could be presented before you and that Ms. Solari could

prove her case beyond a reasonable doubt and that I'm not judged

based on a conspiracy where all the facts are not put together.

And just like any other person that comes in here, I

don't know the law like that. And it's wrong that I don't know

the law, but I can recite some rap lyrics, but I don't know the

Constitution; and I apologize for that. But I'm not a bad

person.

I've never been in trouble before. And even though my

PSI has things in there, all they are is that me talking to some

agents and me trying to get my father out of jail when I was

young. That's in there, and that's the only thing that's

happened. And that's it.

I never sold drugs, never been in no kind of violence,

and it can't be proven, and I'm just here before you today -- I

just don't want to look at my son, who's six years old, and I

gotta tell him that I'm being sentenced for 20 years for some

pieces of paper. I don't want to do that.

You can give me five million dollars in restitution, but

I'm asking Your Honor to give me mercy; and I have to fight for

it. But I was going to come in here and I was going to lay

down, but I can't lay down because it's not right because I

don't have a problem with fighting for this country, and so I

believe that just because I fought for my country, that I

shouldn't be given a fair chance to be like, oh, you fought for

1  your country so you get a slap on your hand; no.  I feel that

2  I'm accountable.  I feel that I should pay this million dollars

3  and I should be sentenced to 10 years.

4       But 20 years, I just don't -- I think the guideline

5  range is just out of whack with that.

6       And even Mr. Eric Holder, the Attorney General, her

7  boss, has stated the same thing in public.  So it's just not me.

8       All I'm saying is that -- that's it.  That's the only

9  thing I wanted to do today.

10      I'm sorry.  I do have a deep respect for the decorum of

11 the courtroom, but I'm very emotional, and I just had to fight

12 for my life today.  I didn't want to go down by letting

13 Ms. Rodman speak for me.

14      And I apologize to Ms. Rodman.  She's been very

15 professional.  She's always been professional, but there were

16 certain things that she left out.  It's not that she's a bad

17 lawyer.  It's just that I don't think that I was given the right

18 to fight for my rights in trial.

19      There wouldn't be 12 people up here that would sentence

20 me to 20 years.  It wouldn't happen.

21      And Mr. Ben Pearce, he's doing his job.  I don't have

22 nothing bad to say about him.  I don't have nothing bad to say

23 about you.  I don't have nothing bad to say about anybody.  Only

24 thing I know is that I shouldn't be sentenced to 20 years, and I

25 just want to change my life; and that's all I can tell.

1    I'm not here, not one of these guys from Savannah that

2    come in here, that kill people or do all this and had a whole

3    bunches of chances and skate on the system.  I'm just one man

4    that I was caught in a situation, I came back from Iraq and I

5    didn't have any money for my family; and that's what happened,

6    and I had an opportunity to make money.

7    They can tell you that, that I always cooperated with

8    them.  I came in, and that's why Mr. Pearce that when I got

9    discharged from the Navy the first time, they gave me a general

10    discharge under honorable conditions because I was a good

11    soldier then.

12    That's why even though I went back into the military by

13    using a fake Social Security card.  Who puts their life in

14    danger going into the military by using a fake Social Security?

15    I put my life in danger, went to Iraq, and my captain didn't

16    take me to court martial, because I was a good soldier.  She

17    still gave me a general discharge.  Why?  Because I'm a good

18    person.  If I wasn't a good person, Your Honor, I would have

19    never gotten a general discharge under honorable conditions.  I

20    would have never gotten a general discharge.  Why?  Because they

21    looked out for me, and I did what I was supposed to do.

22    And the reason that there's not more people on this case

23    is because I don't want them -- they're fathers.  Mr. Borgella

24    is not a father, so that's the reason why I cooperated, and I

25    told the agents I wouldn't have cooperated against him, but my

1   mom told me, you're going to be taken away from your son.

2          And I didn't cooperate against Ms. Ok Cha because she's

3   a 70-year-old lady.  That's why I didn't implicate her and I

4   took the charges for her.  That is the reason why she's not on

5   the stand today in front of you, because I couldn't do that to

6   Ms. Ok Cha, because even though she knows she cashed the million

7   dollars in checks, really in reality, you know, I just don't to

8   want see her spending all those years in prison being 70 years

9   old.

10          And so that's all I have to say, Your Honor, and I

11  apologize for what I did today.  It might have been foolish to

12  come in here and not use my lawyer, but I just knew that I just

13  had to do what I had to do.  And that's all I can say.  I'm just

14  sorry.

15          THE COURT:  You may have a seat.

16          THE DEFENDANT:  Thank you.

17          THE COURT:  And I will hear from the prosecutor.

18  Ms. Solari.

19          MS. SOLARI:  Your Honor, I think Judge Smith when he had

20  the first glance at this case got it right when he called

21  Mr. Brutus an inveterate fraudster.  That is absolutely, without

22  a doubt, what he is and how he has chosen to live his life.

23          Mr. Brutus points out that he's never been in any

24  significant trouble, and on two different occasions he's

25  received general discharges from the military, and Your Honor, I

1    will tell you that, for one, I am absolutely drop-jawed at that.

2         To go into the Navy and claim honorable service to his

3    country, that man walked into the embassies of Iraq, Russia,

4    Cuba and Iran and tried to sell them U. S. information.  So I

5    think it's more than accurate to say that this man probably

6    should have been charged with attempted espionage.  Why he was

7    not, I have no idea, but to invoke the honorable nature of his

8    military service under those circumstances is outrageous.

9         To then enlist in the Army with a fraudulent Social

10   Security Number, he told Special Agent Rogalski he did that so

11   that he could fraudulently obtain military benefits for family

12   members whom we cannot prove exist.

13        Now he invokes a child that he has, maybe or not,

14   depending on the day of the week.  And I'm not sure if he wants

15   to talk about his wife, which one of the three that might be,

16   none of whom probation was able to verify exist.

17        Your Honor, if this man told me it was sunny outside,

18   I'd run and grab an umbrella.  Everything that comes out of his

19   mouth is a fraud and a falsehood.

20        He has scammed banks, the military, the Haitian

21   government, various federal law enforcement agencies.  By his

22   own admission he's engaged in prolonged drug trafficking and

23   money laundering operations.

24        He's walked into the FBI and DEA offices in Tampa,

25   Miami, Jacksonville and Savannah and pedaled them false

1    information in order to curry favor for himself, his friends and

2    his family members.  He has stolen bank account numbers.  He's

3    engaged in check kiting; and this honorable, honorable man, Your

4    Honor, has stolen from the Catholic Charity Neighborhood

5    Services when he worked there part time.

6         Now he's embarked upon a check-cashing scheme to the

7    tune of over a million dollars, and he has been so emboldened by

8    the fact that he has never actually had his chickens come home

9    to roost before that while he was waiting to be taken into

10    federal custody on the day of his arrest, he stood next to

11    Special Agent Rogalski, called USAA and tried to fraudulently

12    insure a pile of worthless watercolor paintings for over

13    $300,000.  Standing next to the FBI agent who's telling you

14    you're going into federal custody for bank fraud.  All right.

15    Well, let me move on to my next scheme.  He's just on to the

16    next thing.

17         He went to the Liberty County Jail and persisted in

18    calling USAA to up his renter's insurance for a bunch of

19    furniture he claimed he bought, none of which was, of course, in

20    his house.  The man is relentless and he won't stop.

21         Now he would like to perpetrate a fraud upon this Court

22    and besmirch Ms. Rodman's professional reputation in order to

23    get a second bite at the apple and have the facts otherwise if

24    he could.

25         It's absolutely ridiculous.  There's nothing this man

1   won't steal and nothing he won't lie about.

2       And Your Honor, the government recommends the top of the

3   Guidelines in this case, if for no other reason than the fact

4   that this man will be a recidivist.  There can be no doubt of

5   that.  Given a pencil, a piece of paper and a stamp, this man

6   will be on to his next scheme from inside the four walls of the

7   prison.  It's not a matter of waiting until he gets out to see

8   him --

9       THE COURT:  Do you think I should appoint Ms. Rodman

10  attorney?

11      MS. SOLARI:  Yes, Your Honor.  It's not a matter of

12  waiting until he gets out, Your Honor, yes.  He's going to need

13  counsel from inside the four walls of the prison.  He'll be on

14  to his next scheme probably before they've even shut the door.

15      It would have been, I think, more than fair to have

16  given him credit for speaking with the government, for assisting

17  us in the arrest of Mr. Borgella, but this defendant shoots

18  himself in the foot over and over again, violating Judge Smith's

19  protective order by disclosing discovery that was not supposed

20  to be disseminated, by again, committing insurance fraud from

21  inside the walls of the jail, and now coming here before this

22  Court trying to convince us that everything he said previously

23  was completely misunderstood and confused, where he's obviously

24  and unfortunately a very intelligent and very articulate person.

25  He knows exactly what he's doing.

1      So Your Honor, although, again, admittedly, he's not a

2  violent person, this is a man who will perpetrate fraud, who

3  will lie and who will steal and who will say anything he needs

4  to to try to get away with it and stay out of trouble.

5      And again, his chickens have come home to roost today.

6  And while we don't often see sentences of this length in

7  white-collar cases, if there was ever one that called for it,

8  Your Honor, I believe it's this one.  So the government would

9  ask for a sentence at the higher end of the guidelines.

10      THE COURT:  I've listened to the defendant, heard

11  evidence.  I've heard her lawyer -- his lawyer.  I've reviewed

12  the presentence report several times.  The Court has looked at

13  the plea agreement; and obviously I've had the transcript, the

14  colloquy on the Rule 11 transcribed, and I've spent time looking

15  at that.

16      I've heard emotional appeals from the defendant.  I've

17  heard clear testimony of the agents, a co-defendant; given that

18  such consideration as it is due.

19      The Court has also considered the factors set forth in

20  18 U.S.C. 3553(a), and pursuant to the Sentencing Reform of

21  1984, it is the judgment of the Court that the defendant, Carlos

22  Andres Brutus, is committed to the custody of the Bureau of

23  Prisons to be imprisoned for a term of 327 months.

24      This sentence is comprised of Counts 1 -- the sentence

25  is comprised of 60 counts, one and -- 60 months.  Is that --

1  well, 327 months as to Count 100 and 60 months as to Count 1, to

2  be served concurrently.

3       That is within the Guidelines.  It is at the outer edge

4  of the Guidelines, or the top of the Guidelines, but the record

5  here needs no massaging by this court.  It speaks for itself.

6       But I am required to say something because the range

7  exceeds 24 months, and the reasons for imposing the selected

8  sentence are as follows:

9       As reflected in the defendant's guideline calculation,

10 he does not, in fact, have a prior criminal conviction, but I

11 would take into this reasons a succinct statement, yes, and even

12 the conclusions stated by Ms. Solari, the prosecutor.  The

13 defendant committed the instant offense while enlisted in the

14 U.S. Army under a false Social Security Number.  While awaiting

15 the trial, the defendant continued to participate in criminal

16 conduct, including violating a protective order and attempting

17 to commit insurance fraud.

18      I have no idea whether the sentence is enough, but

19 nevertheless, it is within the Guidelines, and the Court will

20 adhere to the Advisory Guidelines in this case as appropriate.

21      Restitution is due in the amount of $1,210,410.07 to the

22 Heritage Bank.  The defendant will pay that restitution jointly

23 and severally with Joyie Borgella.

24      Of course, the Court must face, as the taxpayers must

25 face and the government must face, the stark conclusion that the

1    economic circumstances of this defendant do not allow for

2    payment of the full amount of restitution under any reasonable

3    schedule or payment now or in the foreseeable future.

4         Pursuant to 18 U.S.C. 3664(f)(3)(B), nominal payments of

5    either quarterly installments of $25; if he is working in

6    UNICOR, 50 percent -- or prison industries, 50 percent of any of

7    the monthly earnings will be withheld by the Bureau of Prisons

8    and remitted to this Clerk of the Court here for reimbursement.

9         Upon release from imprisonment and while on supervised

10   release, he will make minimum payments, though nominal in nature

11   when we look at the amount, of $500 a month for full

12   restitution.  With the restitution order there is no need of

13   imposing a fine, and he has no ability to pay interest.

14        And he's further ordered to pay to the United States a

15   special assessment of $100 as to each count for a total of $200.

16   That's due immediately, and that, too, will be paid to the Clerk

17   of this Court.

18        Upon release from imprisonment he shall be placed on

19   supervised release for a term of three years as to Count 1 and

20   five years as to Count 100, to be served concurrently; and while

21   on supervised release he will comply with the standard

22   conditions of supervision adopted by this court and those that

23   are made mandatory by 18 U.S.C. 3583.  That includes testing for

24   drug, including urine testing.  He is prohibited forever from

25   owning, using or possessing a firearm or other dangerous weapon.

1    If he should violate any federal, state or local

2  criminal law during the term of supervised release, he will be

3  accountable to that court and that jurisdiction, but it will be

4  a violation of the sentence imposed today.

5    The probation officers will collect a DNA sample

6  pursuant to 18 U.S.C. 3583.  He will participate in a program of

7  testing for drug and alcohol abuse and not tamper with any

8  testing procedure.

9    The probation officers will have full access, and he is

10  ordered to provide full access to any financial information that

11  the Court may seek.  His person, his residence, his office, his

12  vehicle or electronic devices are subject to search.

13    And as part of the J and C, I wish to inform the Bureau

14  of Prisons that access to any telephone, to any computer service

15  should be denied because he will misuse it and perpetuate

16  further frauds.  And so if the Bureau of Prisons allow it, the

17  officer that allows it is complicit in the future fraud.  And I

18  wish that to be stated in that bold language.

19    The probation officers will provide a written statement

20  of the terms and conditions of this sentence.

21    The plea agreement was negotiated.  He swore under oath.

22  He received all of the government's file.  The lawyer met with

23  him on numerous, numerous times.  And the defendant is evasive,

24  tries to leave a window for opportunity to reassert some

25  imaginary right; and therefore, the Court has taken all of that

1  into consideration when accepting the plea, when approving the

2  plea.  And when I look at the Rule 11 procedure in the

3  transcript, I can see there that I must have been concerned

4  about this happening.

5  Nevertheless, in accordance with the plea agreement,

6  Counts 2 through 99 and 101 through 211 of the indictment are

7  dismissed as to this defendant.  He is to remain in the custody

8  of the United States Marshal.

9  Pursuant to the plea agreement, with limited

10  exceptions -- and I don't believe any of those are applicable

11  now because he was sentenced within the Guidelines -- the

12  defendant has waived all rights conferred by 18 U.S.C. 3742 to

13  appeal the sentence.  He's waived the right to appeal the

14  sentence on any other ground and waived the right to attack the

15  sentence in any post-conviction proceeding.

16  Now, are there any objections to the Court's finding of

17  fact, conclusion of law or the manner in which the sentence was

18  pronounced?  And will the defendant and counsel come up to the

19  lectern.

20  MS. SOLARI:  No objections from the government, Your

21  Honor.

22  MS. RODMAN:  One thing, Judge, before we conclude.  I

23  would like to put it on the record that I did have extensive

24  argument prepared both on the leadership role enhancement and as

25  to sentencing that Mr. Brutus did not want me to communicate to

1  the Court.  I just want to put that on the record.

2       THE COURT:  All right.  Are there any objections to the

3  Court's finding of fact, conclusion of law or the manner in

4  which the sentence was pronounced?

5       Certainly you wish to readopt your objections that were

6  filed, Ms. Rodman.

7       MS. RODMAN:  Yes, Judge.

8       THE COURT:  And the defendant has had several

9  opportunities here this morning to articulate his objections to

10  the Court's finding for the denial of allowing him to represent

11  himself at this hearing.

12       Is there anything else you wish to object to,

13  Mr. Brutus?

14       THE DEFENDANT:  At this time as far as what, Your Honor?

15  Like objecting to the sentence that you just gave me?

16       THE COURT:  Well, I'm going to allow you -- everything

17  you've said will become part of the record.  You do not have to

18  rearticulate it.  But the record will note your objection.

19       But if there's anything in addition you wish to object

20  to, you may do so at this time.  Your lawyer has preserved

21  argument on the objections she made.  Anything else you wish to

22  say?

23       THE DEFENDANT:  Only objection that I have is to not

24  being allowed to represent myself today and ineffective

25  assistance of counsel and the sentence that I was given that I

1  still to this day, I still am saying that I did not enter this

2  plea knowingly, intelligently and with the understanding of its

3  consequences.  That did not happen.

4       THE COURT:  So be it.  Objection is noted and overruled.

5  You are remanded to the marshal.

6       Thank you, Ms. Rodman.  Some experience will go in your

7  memoirs.  We'll take a short recess.

8            (Proceedings concluded at 11:13 a.m.)

9               - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly McKee Dorsey, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of April, 2014.

*Kelly McKee Dorsey*
_____

KELLY McKEE DORSEY, CCR, RPR, CRR

#2731